**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DAVID D.,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **vs.** | : | **NO. 25-cv-4836** |
| | : | |
| **FRANK BISIGNANO,** | : | |
| **Commissioner of Social Security,** | : | |
| **Defendant.** | : | |

**MEMORANDUM OPINION**

**LYNNE A. SITARSKI**
**UNITED STATES MAGISTRATE JUDGE** **October 28, 2026**

David D. (Plaintiff) brought this action seeking review of the Commissioner of Social Security Administration's (SSA) decision denying his claim for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f (the Act). This matter is before me for disposition upon consent of the parties. For the reasons set forth below, Plaintiff's Request for Review (ECF No. 12) is **DENIED**.

## I. PROCEDURAL HISTORY

Plaintiff filed applications for Titles II and XVI disability benefits on March 31, 2023, alleging disability beginning January 1, 2017, due to numbing in the right hand, high blood pressure, asthma, high cholesterol, diabetes type 2, bronchitis, posttraumatic stress disorder, depression and anxiety. (R. 218-31, 267). Plaintiff's applications were denied at the initial level on June 21, 2023, and upon reconsideration on December 12, 2023. (R. 56-67, 70-80). Plaintiff requested a hearing before an Administrative Law Judge (ALJ). (R. 118-19). On August 7, 2024, Plaintiff amended the alleged onset date to June 1, 2023, and accordingly withdrew his claim for Title II benefits. (R. 330). Plaintiff, represented by counsel, as well as a vocational

expert, testified at the August 14, 2024, administrative hearing. (R. 35-54). On May 28, 2024, the ALJ issued a decision unfavorable to Plaintiff. (R. 14-39). Plaintiff appealed the ALJ's decision, and the Appeals Council denied Plaintiff's request for review on July 1, 2025, thus making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. (R. 1-6).

On August 22, 2025, Plaintiff filed a complaint in this Court and consented to my jurisdiction pursuant to 28 U.S.C. § 636(c) five days later. (Compl., ECF No. 1; Consent, ECF No. 5). On February 3, 2026, Plaintiff filed a Brief and Statement of Issues in Support of Request for Review. (Pl.'s Br., ECF No. 12). The Commissioner filed a Response on March 5, 2026. (Resp., ECF No. 13). Plaintiff filed a Reply on March 18, 2026. (Reply, ECF No. 12).

## II. FACTUAL BACKGROUND[1]

The Court has considered the administrative record in its entirety and summarizes here the evidence relevant to the instant request for review.

Plaintiff was born on October 16, 1970, and was 52 years old on the amended alleged disability onset date of June 1, 2023. (R. 273). He graduated high school. (R. 268). He previously worked as a welder, meat packer and janitor. (R. 268-69).

### A. Medical Evidence

On June 1, 2023 (i.e., the alleged disability onset date), State agency psychological consultant Jennifer Croyle, Psy.D., issued a Disability Determination Explanation classifying Plaintiff's mental disorders as "severe" but noting that she lacked sufficient evidence to determine any limitations. (R. 64-65). Upon reconsideration on December 11, 2023, Anthony

[1] Plaintiff's claims implicate only the evidence related to his right upper extremity and mental impairments. The Court limits its summary of the record accordingly.

Galdieri, Ph.D., reached the same conclusion. (R. 78-79).

On June 20, 2023, State agency medical consultant Ruth Arnold, D.O., issued a Disability Determination Explanation noting that she lacked sufficient evidence to evaluate Plaintiff's alleged physical conditions. (R. 63). Upon reconsideration on September 14, 2023, Kevin Hollick, D.O., endorsed this conclusion. (R. 72).

On August 16, 2023, Plaintiff presented to Jennifer Candelario, LPC, at Public Health Management Corporation in Philadelphia (PHMC) for a behavioral health consultation for depression following a referral from his primary care provider, Cheryl Rae Hinmon, N.P., also of PHMC. (R. 582). He reported a history of recurrent, moderate depressive episodes and trauma (specifically, the loss of his father and having previously been shot). (*Id.*). He described experiencing hypervigilance, nightmares, and hyperarousability stemming from the gunshot. (*Id.*). Upon examination, Plaintiff had a depressed mood, although the results were otherwise normal. (R. 583). On September 22, 2023, he again reported nightmares and exhibited a depressive mood, as well as a constricted affect and impaired recent memory. (R. 575).

Plaintiff first complained of "intermittent" numbness, tingling and weakness in his right arm at a December 27, 2023, visit with Hinmon. (R. 551). She noted that he had "old scarring" from a gunshot wound in the right upper extremity, could not extend his right shoulder beyond 90 degrees, and had "weakness and numbness" in his right forearm and fingers and "3-4/5 grasp" in his right hand. (R. 552). He also exhibited dysphoric and anxious mood. (R. 551-52). She diagnosed him with chronic right shoulder pain, numbness in the right upper extremity, prior gunshot wound, major depressive disorder, recurrent, moderate, and unspecified trauma- and stressor-related disorder and referred him to orthopedics, pain management, and psychiatry. (R. 553). She added that Plaintiff was "[r]equired to see multiple specialists in efforts to determine disability status." (R. 551-52).

On January 30, 2024, Plaintiff presented to Allison Huss-PAC at Penn Medicine Orthopedics in Philadelphia for an evaluation of his right shoulder. (R. 496). She noted that Plaintiff had been shot two to three years earlier and had also dislocated his shoulder (apparently at that time) but that his pain had not begun until approximately three months ago, despite no new injury or trauma. (*Id.*). He reported weakness in the right arm. (*Id.*). Upon examination, Plaintiff had reduced range of motion (ROM) in his cervical spine and right shoulder, positive Spurling's and Jobe's tests, right deltoid atrophy, "3+ out of 5" grip and right shoulder strength, and "4/5 strength with resisted external rotation." (R. 496-97). X-rays of the right shoulder reflected "a large subacromial spur and sclerosis at the lateral humeral head." (R. 497). New diagnoses included cervical radiculopathy and a traumatic, complete tear of the right rotator cuff. (*Id.*).

At a February 27, 2024, visit with Hinmon, upon examination Plaintiff demonstrated the same physical deficiencies, but his mood was "improved" and no longer dysphoric or anxious, and he reported, "I actually feel a little better taking this Zoloft." (R. 538-40).

A March 6, 2024, MRI of the right shoulder showed: "Rotator cuff degeneration. Full-thickness tear in anterior to mid attaching fibers of the supraspinatus tendon. Tendinosis and interstitial tear of the long head of biceps tendon. Mild glenohumeral and moderate acromioclavicular joint degenerative changes. Small subacromial/subdeltoid bursal fluid. Edema signal along the joint capsule in the rotator interval . . . ." (R. 628).

On March 13, 2024, Plaintiff presented to Sharon Lewis, M.D., of the Electromyography (EMG) Laboratory at the Penn Comprehensive Neuroscience Center in Philadelphia for another right shoulder evaluation. (R. 673). At this appointment, he reported that he was shot in 2001. (*Id.*). He complained of pain running the entire length of his right upper extremity, from the shoulder to the fingertips. (*Id.*). Upon examination, his strength in the extremity "was

proportional to effort." (*Id.*). He had reduced ROM in the shoulder, but it "was strong (5/5)." (*Id.*). In the right arm, pinprick sensation "was diminished in a patch distribution" and "ulnar sensory amplitude was moderately diminished," but vibration sensation, median and radial sensory responses, median and ulnar motor responses, and "[n]eedle EMG of select muscles" were all normal. (*Id.*). Arm reflexes were also symmetrical. (*Id.*). Impressions included moderate, right-sided ulnar sensory neuropathy "of doubtful clinical significance"; mild, right-sided carpal tunnel syndrome; but no evidence of crevicular radiculopathy, brachial plexopathy, "or any other neuromuscular abnormality . . . ." (*Id.*).

On April 25, 2024, John Horneff, M.D., reviewed the MRI results with Plaintiff. (R. 629). At that time, Dr. Horneff noted that he generally agreed with the above interpretation but added that Plaintiff had minimal tendon retraction, "no sign of any significant muscle atrophy of the associated muscle belly," and "no other sign of fracture or dislocation." (*Id.*). Upon examination of his shoulder, Plaintiff exhibited "70/120" ROM with forward flexion, "70/90" ROM with abduction, and "30/45" ROM with external rotation, but Dr. Horneff highlighted that Plaintiff "was actively resisting range of motion." (R. 627-28). Additional testing showed "4/5" strength with forward flexion, "4+/5" strength with abduction, and full strength with external and internal rotation. (R. 627). Two impingement tests – a Neer test and "pain relieved with scapular assist" – were positive, as was a Speed's test and a test for capsular irritation. (R. 627-28). However, Dr. Horneff doubted that Plaintiff had a frozen shoulder. (R. 628). Moreover, testing on the remainder of the right upper extremity was normal, with full ROM in the hand, wrist and elbow; no neurovascular deficits in the radial, median and ulnar nerve distributions; and warm and well-perfused distal extremities, "with a 2+ distal radial pulse." (*Id.*).

Dr. Horneff discussed surgical and nonsurgical treatment options with Plaintiff and advised that "rotator cuff repair is a reasonable option," but he "strongly recommended" that

Plaintiff address bleeding in his stool, stop smoking, and stop drinking six beers daily before proceeding with any surgery. (*Id.*). In the meantime, he prescribed Nicoderm for smoking cessation and meloxicam for pain. (*Id.*).

After reviewing Plaintiff's records at the direction of his attorneys, Virginia Pierce, MS, APRN-CP, opined on August 7, 2024, that due to the full rotator cuff tear in his right shoulder he was limited to carrying and lifting for less than three hours per workday with his right upper extremity. (R. 689-90). In support of this conclusion, she cited Plaintiff's January 30, 2024, visit with Huss, his associated imaging results, his April 25, 2024, visit with Dr. Horneff, and his subjective complaints. (R. 690-91). She also explained the nature of a rotator cuff and the symptoms commonly resulting therefrom. (R. 691).

**B. Nonmedical Evidence**

The record also contains nonmedical evidence. Plaintiff testified at the August 14, 2024, administrative hearing that he stopped working due to pain in his right shoulder, which is his dominant side. (R. 43, 47). He stated that he has had pain there for "some years," but it worsened to the point that he "barely can move." (R. 43). He indicated that he can raise his arm straight out at shoulder height and above but that doing so is "very painful" and causes "pop[ping]" due to the bone "rubbing." (R. 43-44). He claimed that even lifting a gallon of milk is "so painful" that he drops it. (R. 44). Plaintiff reported that he could cook simple meals and wash dishes afterwards without pain, engage in personal care with pain, and do laundry and clean his apartment with his right side for up to 10 minutes before having to switch to the left. (R. 45-46). Additional activities included going for walks and socializing with neighbors and a friend. (R. 47). He also related that he was taking prescription medication for his pain, which helped "a little," but that he did not use ice or heat. (R. 46). He added that he had not pursued surgery because his providers wanted him first to address the blood in his stool, which required

him to mail a kit, but he had not done so.[2] (R. 45).

## III. ALJ DECISION

Following the administrative hearing, the ALJ issued a decision in which she made the following findings:

1. The claimant has not engaged in substantial gainful activity since December 31, 2019.
2. The claimant has not engaged in substantial gainful activity since June 1, 2023, the amended alleged onset date (20 CFR 416.971 *et seq.*).
3. The claimant has the following severe impairments: rotator cuff tear of the right upper extremity, osteoarthritis, and right carpal tunnel syndrome (20 CFR 416.920(c)).
4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).
5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except he should never climb ladders, ropes, or scaffolds. He is capable of unlimited climbing of ramps and stairs, balancing, stooping, kneeling and crouching. He is capable of occasional crawling. He is capable of frequent fingering, handling, and feeling with the right upper extremity. He is capable of occasional reaching overhead with the right upper extremity. The

[2] Plaintiff did not testify at the hearing regarding any mental impairments.

claimant is capable of tolerating occasional exposure to vibration and any workplace hazards such as moving machinery or unprotected heights.

6. The claimant has no past relevant work (20 CFR 416.965).

7. The claimant was born on October 16, 1970, and was 46 years old, which is defined as an individual closely approaching advanced age, on the date the alleged disability onset date (20 CFR 416.963).

8. The claimant has at least a high school education (20 CFR 416.964).

9. Transferability of job skills is not an issue in this case because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2017, through the date of this decision (20 CFR 416.920(g)).

(R. 11-22). Accordingly, the ALJ found Plaintiff was not disabled. (R. 22).

## IV. LEGAL STANDARD

To be eligible for benefits under the Social Security Act, a claimant must demonstrate to the Commissioner that he cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months. 42 U.S.C. § 1382c(a)(3)(A). A five-step sequential analysis is used to evaluate a disability claim:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, then the Commissioner considers in the second step whether the claimant has a "severe impairment" that significantly limits his physical or

> mental ability to perform basic work activities. If the claimant suffers a severe impairment, the third inquiry is whether, based on the medical evidence, the impairment meets the criteria of the impairment listed in the "listing of impairments," . . . which result in a presumption of disability, or whether the claimant retains the capacity to work. If the impairment does not meet the criteria for a listed impairment, then the Commissioner assesses in the fourth step whether, despite the severe impairment, the claimant has the residual functional capacity to perform his past work. If the claimant cannot perform his past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

*Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000); *see also* 20 C.F.R. § 416.920(a)(4). The disability claimant bears the burden of establishing steps one through four. If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner at step five to establish that, given the claimant's age, education, work experience, and mental and physical limitations, he is able to perform substantial gainful activities in jobs existing in the national economy. *Poulos v. Comm'r. of Soc. Sec.*, 474 F.3d 88, 92 (3d Cir. 2007).

Judicial review of a final decision of the Commissioner is limited. A district court is bound by the factual findings of the Commissioner if they are supported by substantial evidence and decided according to correct legal standards. *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence is "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate." *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 118 (3d Cir. 2000) (citations omitted). Even if the record could support a contrary conclusion, the decision of the ALJ will not be overruled as long as there is substantial evidence to support it. *Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986). The court has plenary review of legal issues. *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999).

## V. DISCUSSION

In his request for review, Plaintiff raises two issues:

1. The ALJ committed legal error in failing to properly evaluate the opinion from NP Pierce under supportability and consistency as required by 20 C.F.R. § 416.920c, precluding a substantial evidence review.

2. The ALJ crafted an RFC that was not guided by interpretation of objective evidence from a medical professional, leading to a determination that was not supported by substantial evidence.

(Pl.'s Br., ECF No. 12, at 1 (reordered)).

**A. Consideration of Pierce's Medical Opinion**

The ALJ explained her analysis of Pierce's opinion as follows:

> In August 2024, Virginia Pierce, M.S., A.P.R.N.-C.N.P., opined the claimant was limited to using his right upper extremity for carrying and lifting for less than three hours in an eight-hour workday (Exhibit 9F). Although Ms. Pierce identified specific medical records she reviewed in support of her opinion, her conclusion is not persuasive because it is not consistent with the medical record. In this regard, an examination in March 2024, revealed full strength. The following month, the orthopedic surgeon indicated that the claimant had reduced range of motion on the right shoulder, with 4/5 strength on forward flexion and 4+/5 strength on abduction. However, he demonstrated full range of motion on the hand, wrist, and elbow (Exhibit 7F).

(R. 19).

**1. The Parties' Arguments**

After setting forth the relevant background law, Plaintiff posits that this discussion was inadequate as to supportability and consistency, both of which must be addressed under the regulations. (Pl.'s Br., ECF No. 12, at 10 (citing 20 C.F.R. § 416,920c(b)(2))). First, he submits that the ALJ's "passing reference" to supportability fails to indicate whether the factor was considered favorably or unfavorably to the opinion's persuasiveness and further observes that the ALJ never explained how the referenced records did not support it. (*Id.* at 11 (citing *Rodney Edward G. v. O'Malley*, 743 F. Supp. 3d 653, 661 (E.D. Pa. 2024))). He then parses the records cited by Pierce to back her opinion regarding his limited use of his right upper extremity and questions how this evidence did not support her determination that he should be restricted to less

than three hours of lifting and carrying on that side per workday. (*Id.* (citing R. 496-97, 690-91)). Relatedly, he declares that "it is hard to imagine" how the shoulder limitation found by Pierce is inconsistent with this evidence. (*Id.*). He cites other evidence seemingly consistent with her findings, suggests that the ALJ cherry-picked the record and contends that the ALJ's observation that he continues to exercise full ROM throughout the rest of his upper right extremity "has little to do" with Pierce's proposed restriction stemming from his right shoulder problems. (*Id.* at 11-12 (citing *Reilly v. Saul*, 498 F. Supp. 3d 688, 698 (E.D. Pa. 2020); R. 539, 627-28)). Lastly, he maintains that these alleged errors were harmful because the VE testified that a restriction to only occasionally carrying, lifting or reaching with the right upper extremity would preclude all work and because the VE was never asked what work someone limited to three hours of lifting and carrying with the right upper extremity could perform. (*Id.* at 12).

After also summarizing the relevant background law, the Commissioner counters that Pierce reviewed Plaintiff's medical records at his attorney's request but offered only a vague opinion regarding how long per workday he could lift and carry with his right upper extremity without specifying the amount of weight at issue or addressing his abilities using both upper extremities, even though these considerations are relevant to the RFC. (Resp., ECF No. 13, at 9 (citing R. 689-91)). The Commissioner notes the ALJ's acknowledgment that Pierce cited three supporting records but emphasizes her explanation that the opinion was nonetheless not consistent with the remainder of the record, including examination results showing full strength in the left shoulder and near-full to full strength, full external and internal rotation, and four-out-of-five (or better) flexion and abduction in the right one. (*Id.* at 10 (citing R. 19, 662, 673, 690-91)). In sum, the Commissioner asserts that the ALJ reasonably concluded that Pierce's opinion was outweighed by other, more probative evidence that indeed reflected limitations with Plaintiff's right upper extremity, but that these could be accounted for with the restrictions set

forth in the RFC. (*Id.* (citing R. 17-20)). He maintains that this Court should defer to those findings because they are supported by substantial evidence and because the regulatory framework was properly applied. (*Id.* (citing *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999))).

In a brief reply, Plaintiff characterizes the Commissioner's argument as "the ALJ's consistency analysis did the work for the required supportability analysis" and reiterates that the ALJ, who relied upon a record not cited by Pierce, did not explain how the records she cited and her proffered explanations did not support her findings. (Reply, ECF No. 14, at 3 (citing Exs. 3F, 5F, 7F)). He thus concludes that any suggestion that the consistency analysis "doubled" for a supportability analysis "falls flat" because the ALJ "never engaged with" the records cited by Pierce in support of her opinion. (*Id.*).

**2. Analysis**

The ALJ is responsible for fashioning a claimant's RFC, including his mental RFC. A claimant's RFC is what he can still do despite his established impairments. 20 C.F.R. § 416.945(a)(1). In making an RFC determination, the ALJ must consider all evidence before him or her. *See Plummer v. Apfel*, 186 F.3d 422, 429 (3d. Cir. 1999). That evidence includes medical records, observations made during formal medical examinations, descriptions of limitations by the claimant and others, and observations of the claimant's limitations by others. *See Fargnoli v. Massanari*, 247 F.3d 34, 41 (3d Cir. 2001); 20 C.F.R. § 416.945(a). An ALJ must consider the medical opinions together with the rest of the relevant evidence, and explain the weight given to those opinions in his or her decision. *Chandler*, 667 F.3d at 362. While there is an undeniable medical aspect to the evaluation of medical opinions, it is well settled that "[t]he ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations." *Id.* at 361. When confronted with several medical

opinions, the ALJ can choose to credit certain opinions over others but "cannot reject evidence for no reason or for the wrong reason." *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir. 1993) (quoting *Cotter v. Harris*, 642 F.2d 700, 707 (3d Cir. 1981)). Further, the ALJ can credit parts of an opinion without giving credit to the whole opinion and may formulate a claimant's RFC based on different parts of different medical opinions, so long as the rationale behind the decision is adequately articulated. *See, e.g.*, *Byrd v. Comm'r of Soc. Sec.*, No. 23-4957, 2024 WL 4631645, at *9 (E.D. Pa. Oct. 30, 2024); *Durden v. Colvin*, 191 F. Supp. 3d 429, 455 (M.D. Pa. 2016).

The social security regulations "require, an ALJ to offer 'a narrative discussion describing how the evidence supports'" the limitations imposed. *Hess v. Comm'r of Soc. Sec.*, 931 F.3d 198, 209 (3d Cir. 2019) (citing SSR 96-8P, at *7). An "ALJ 'may not reject [a physician's findings] unless he first weighs them against other relevant evidence and explains why certain evidence has been accepted and why other evidence has been rejected.'" *Mason*, 994 F.2d at 1067 (quoting *Kent v. Schweiker*, 710 F.2d 110, 115 n.5 (3d Cir. 1983)); *see also Carter v. Railroad Retirement Bd.*, 834 F.2d 62, 65 (3d Cir.1986).

When evaluating medical evidence, the most important factors are supportability and consistency, and the ALJ must explain how he or she considered these factors for a medical source's medical opinions or prior administrative medical findings in the determination or decision. 20 C.F.R. § 416.920c(a)-(c). The remaining factors include the medical source's relationship with the claimant, the medical source's specialization, and other factors that tend to support or contradict the medical opinion. *Id.* at § 416.920c(c). An ALJ, in his or her discretion, need only reference these other factors if he or she finds that two medical opinions about the same issue are equally persuasive, well-supported, and consistent with the record evidence. *Id.* at § 416.920c(b)(3).

Although the ALJ is not required "to use particular language or adhere to a particular

format in conducting [the] analysis," the decision must contain "sufficient development of the record and explanation of findings to permit meaningful review." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (citing *Burnett*, 220 F.3d at 119). The ALJ must provide "not only an expression of the evidence he considered which supports the result, but also some indication of the evidence which was rejected." *Cotter*, 642 F.2d at 705; *see also Burnett*, 220 F.3d at 121 ("Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence which he rejects and his reason(s) for discounting such evidence."). "In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Id.*

Here, Plaintiff's focus on the ALJ's supportability analysis is a red herring. Plaintiff overlooks the fact that the ALJ gave no indication whatsoever that Pierce's opinion was not persuasive because it was not well-supported. On the contrary, the ALJ acknowledged that "Ms. Pierce identified specific medical records she reviewed in support of her opinion . . . ." (R. 19). The ALJ's consideration of this factor might have been more robust or explicit, but her reference to specifically identified evidence that supports the opinion suffices to permit this Court to trace her logic and meaningfully review her decision. *See Gross v. Comm'r of Soc. Sec.*, 653 F. App'x 116, 120 (3d Cir. 2016) (the Act requires only that the agency's path "may reasonably be discerned") (quoting *Christ the King Manor, Inc. v. Sec'y of Health & Hum. Servs.*, 730 F.3d 291, 305 (3d Cir. 2013)). Moreover, the ALJ further clarified that supportability was not the problem when she contrasted the finding regarding that factor (through use of the word "although") with her additional determination that Pierce's "conclusion is not persuasive because it is not *consistent* with the medical record." (R. 19 (emphasis added)); *see Blackman v. Kijakazi*, 615 F. Supp. 3d 308, 315 (E.D. Pa. 2022) ("[A]n ALJs decision is to be 'read as a whole . . . .'") (quoting *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004)). Thus, under any

fair reading, the ALJ found that Pierce's opinion was well-supported, rendering Plaintiff's attacks on that prong of the analysis moot.

Turning to the other prong, Plaintiff concedes that the ALJ "engaged in a consistency analysis here," (Reply, ECF No. 14, at 3), but he nonetheless faults her for allegedly cherry-picking only favorable evidence supporting her desired outcome. *See Fanelli v. Colvin*, No. 3:16-CV-1060, 2017 WL 551907, at *9 (M.D. Pa. Feb. 10, 2017) ("mention[ing] only isolated facts that militate against the finding of disability and ignores much other evidence that points another way[ ] amounts to a 'cherry-picking' of the record") (citations omitted). However, that is not what happened in this case. On one hand, the ALJ relied upon the largely benign results of two examinations of Plaintiff's right upper extremity, one (in March 2024) in which Plaintiff demonstrated full strength in the shoulder and a second the following month in which he exhibited four-out-of-five or better strength with different shoulder movements, as well as full ROM in the hand, wrist, and elbow (even if, as acknowledged by the ALJ, it was "reduced" in the shoulder).[3] (R. 19 (citing Ex. 7F)). On the other hand, Plaintiff points to the results of two examinations from this period which showed limited shoulder and grip strength, "guarding" with certain shoulder movements, somewhat reduced abduction range, and positive results with various shoulder tests. (Pl.'s Br., ECF No. 12, at 11-12 (citing R. 539, 627-28)). Thus, there was a substantial body of evidence on each side, one set of records mostly consistent with Pierce's opinion and the other set mostly inconsistent. Under these circumstances, it was well within the ALJ's prerogative to find her opinion not persuasive on consistency grounds. *See Perkins v. Barnhart*, 79 F. App'x 512, 514-15 (3d Cir. 2003) ("[The claimant's] argument here amounts to no more than a disagreement with the ALJ's decision, which is soundly supported by substantial

[3] The ALJ also acknowledged the existence of contrary evidence, at least broadly, when she referenced the supporting records reviewed by Pierce. (R. 19).

evidence."); *Burnett*, 220 F.3d at 118 (substantial evidence is "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate"); *Simmonds*, 807 F.2d at 58 (even if the record could support a contrary conclusion, the decision of the ALJ will not be overruled as long as there is substantial evidence to support it).

For these reasons,[4] the Court declines to remand this matter on the proffered basis.

**B. Substantial Evidence**

**1. The Parties' Positions**

Plaintiff next posits that the ALJ's decision was unsupported by substantial evidence because the RFC was not the result of interpreting objective evidence from a medical professional. (Pl.'s Br., ECF No. 12, at 3-5 (citing *Doak v. Heckler*, 790 F.2d 26, 29 (3d Cir. 1986); *Copes v. Berryhill*, No. 16-5735, 2019 WL1455443, at *4 (E.D. Pa. Apr. 1, 2019); *Biller v. Acting Comm'r of Soc. Sec.*, 962 F. Supp. 2d 761, 779 (W.D. Pa. 2013) (citing *Doak*))). After again setting forth some background law, Plaintiff notes that the record contained no administrative findings from the State agency physical consultants (who concluded that there was "insufficient evidence" to offer any), (*see* R. 58, 71), and that the ALJ rejected Pierce's opinion, (*see, supra*, § V.A), leaving her with only her own lay interpretation of "the imaging of the right shoulder and physical limitation findings" to guide her RFC determination. (Pl.'s Br., ECF No. 12, at 3-6 (citing R. 19, 58, 71, 690-91)). However, Plaintiff insists that the record

---

[4] Relatedly, Plaintiff complains that the ALJ's reliance, in part, on his full ROM in his hand, wrist and elbow is largely unconnected to Pierce's proposed "restriction based on right shoulder limitation," (Pl.'s Br., ECF No. 12, at 12), but this contention ignores the fact that this restriction was for the "right upper extremity" as a whole, (R. 690), of which the hand, wrist, and elbow are indisputably components. Indeed, when making his case in his brief that the ALJ had selectively considered the evidence in her consistency analysis, Plaintiff led by observing that, at one examination, he demonstrated limited "grasp of the right hand." (*Id.* (citing R. 539)). Thus, Plaintiff's own briefing reveals that he considers the use of the component parts of the upper extremity to be relevant to its overall functioning.

pertaining to his right shoulder "was far too complex" for the ALJ "to guess at" his functional abilities, especially in light of Pierce's opinion. (*Id.* at 6). He also reiterates that no hypothetical was ever posed to the VE incorporating Pierce's proffered limitation of only three hours of right-sided lifting and carrying per workday. (*Id.* (citing *Bruce v. Berryhill*, 294 F. Supp. 3d 346, 357 (E.D. Pa. 2018))). He therefore declares that "the ALJ's rejection of the only opinion in the file and rendering a *less* restrictive RFC was error." (*Id.* (emphasis in original)).

Plaintiff then summarizes the medical evidence regarding his right shoulder at some length. (*Id.* at 6-8). He notes his complaints of symptoms to Hinmon in December 2023, her positive examination findings at that time (and again in February 2024), and similar problems reported in January 2024 to Huss, who also recorded positive findings upon examination. (*Id.* at 6-7 (citing 496-97, 539, 551-52); *see also, supra*, § II.A (discussing this evidence in greater detail)). He further highlights the results of his March 2024 MRI and various positive findings upon examination by Dr. Horneff in April 2024, including his diagnosis of a "traumatic complete tear of the right rotator cuff." (Pl.'s Br., ECF No. 12, at 7 (citing R. 528, 627-28); *see also, supra*, § II.A). Plaintiff adds that Dr. Horneff suggested that surgery was "a reasonable option," but that he should first address blood in his stool and quit smoking. (Pl.'s Br., ECF No. 12, at 8 (citing R. 628)). He repeats that remand is required because this factual record was too complicated for the ALJ to have determined the RFC when the only medical opinion regarding his physical functioning, if credited, would likely have resulted in him being found disabled. (*Id.* (citing *Copes v. Berryhill*, No. 16-5735, 2019 WL 1455443, at *4 (E.D. Pa. Apr. 1, 2019))).

Turning to the mental health evidence, Plaintiff observes that the State agency psychological consultants lacked sufficient evidence to opine on the extent of any mental limitations, but that in the second half of 2023 he reported various symptoms to Candelario stemming from having been shot and the death of his father, he was depressed and anxious upon

examination, and she diagnosed him with depressive and trauma/stressor disorders. (*Id.* at 8-9 (citing R. 483, 552-53, 575, 582)). Noting that an ALJ should not substitute his or her view for that of a qualified professional, "especially in cases that involve mental disability," he adds that the ALJ found no mental limitations during the psychiatric review technique at step two (or, accordingly, in the RFC), even though the consultants opined that his mental impairments were "severe" (notwithstanding the limited evidence). (*Id.* at 9 (citing R. 16-18, 58-59, 72-73; *Copes*, 2019 WL 1455443, at *4)). Plaintiff posits that the ALJ's mental findings "therefore would seem to contravene" the consultant reports, given that case law defines a severe impairment as one that "significantly limits" basic abilities. (*Id.* (citing *Ramirez v. Barnhart*, 372 F.3d 546, 550 (3d Cir. 2004) (internal citation omitted))). Insisting that the decision is currently unsupported by substantial evidence, he suggests that the case should be remanded for the ALJ to order a mental consultative examination, recontact one of his mental health providers for an opinion or otherwise develop the record further. (*Id.* at 9-10 (citing 20 C.F.R. § 416.912(b); *Donat v. Berryhill*, No. 17-5096, 2018 WL 3186953, at *5 (E.D. Pa. June 28, 2018))).

Distinguishing *Doak* and its progeny as relying on an earlier version of the regulations that described the RFC as a "medical" rather than "administrative" assessment, the Commissioner sets forth his own statement of the background law and denies that the ALJ was required to base the RFC on any particular medical opinion. (Resp., ECF No. 13, at 3-6 (citing 20 C.F.R. §§ 416.945, 416.946; SSR 96-8p; *Titterington v. Barnhart*, 174 F. App'x 6, 11 (3d Cir. 2006)) (additional citations omitted)). He asserts that, instead, the ALJ independently reviewed the relevant evidence in accordance with applicable regulations and formulated an appropriate RFC restricting Plaintiff to occasional reaching with his right upper extremity due to his rotator cuff tear and frequent handling, fingering, and feeling due to his carpal tunnel syndrome. (*Id.* at 6-7 (citation omitted)). The Commissioner catalogs the supporting evidence regarding Plaintiff's

right shoulder cited by the ALJ in support of her determination, including limited but still substantial ROM, only mildly reduced strength, and a single visit to orthopedics at which meloxicam was prescribed and surgery was discussed but Plaintiff was advised that any surgery should await his resolution of more pressing issues, such as blood in his stool. (*Id.* at 6 (citing R. 18-19, 551-53, 628, 662-64)). The Commissioner adds that as of the administrative hearing four months after this visit, Plaintiff had still not undergone an evaluation for his bloody stool so that he could, in turn, move forward with any shoulder surgery. (*Id.* at 6 n.3). He further inventories the evidence cited by the ALJ to support her finding regarding Plaintiff's use of his right hand, such as a lack of any treatment for carpal tunnel, no neurovascular deficits in the relevant nerves, and examinations showing a full-strength grip and complete ROM in the hand and wrist. (*Id.* at 7). Accordingly, the Commissioner observes that even though the ALJ rejected Pierce's opinion requested by Plaintiff's attorneys and the State agency consultants lacked sufficient evidence to opine, the record nonetheless contained ample diagnostic and other objective evidence upon which the ALJ could base her decision. (*Id.* (citing R. 18-19, 63, 77-78, 689-91)).

As for the ALJ's discussion of the mental health evidence, the Commissioner observes that the ALJ considered the record as it pertained to Plaintiff's diagnoses for depression, trauma and stress-related disorders—including a normal examination just two months after the diagnoses, the lack of evidence of relevant deficits, and that he sought no specialized mental health treatment during the relevant period—but explained that Plaintiff's impairments were non-severe and did not lead to restrictions in the RFC. (*Id.* at 8 (citing *Pet. of Sullivan*, 904 F.2d 826, 845 (3d Cir. 1990))).

For these reasons, the Commissioner concludes that the ALJ met the low and deferential substantial evidence standard when she sufficiently articulated grounds that a reasonable mind might accept as adequate to support the decision. (*Id.* (quoting *NLRB v. Columbian Enameling*

*& Stamping Co.*, 306 U.S. 292, 300 (1939) for the proposition that "[s]ubstantial evidence requires only 'enough to justify, if the trial were to a jury, a refusal to direct a verdict'")). Because Plaintiff would not be entitled to a directed verdict in this matter, the Commissioner asks that his request for remand be denied.

In a short reply, Plaintiff denies that his argument is that the RFC must mirror an opinion in the record and maintains that it is instead that an RFC is unsupported by substantial evidence where the State agency reviewing consultants lack sufficient evidence to evaluate the claim and the ALJ rejects the only relevant opinion in favor of a less restrictive RFC based on his or her own lay interpretation. (Reply, ECF No. 14, at 1-2 (citing *Hobart v. Kijakazi*, No. 4:21-cv-02152, 2023 WL 2142965, at *5-7 (M.D. Pa. Feb. 21, 2023) (internal citation omitted); *Kenyon v. Saul*, No. 1:20-cv-1372, 2021 WL 2015067, at *9 (M.D. Pa. May 19, 2021))). He also repeats that the alleged errors were harmful because the VE testified that only occasional lifting and carrying with the right upper extremity would preclude all work. (*Id.* at 3).

**2. Analysis**

As the Commissioner observes, (Resp., ECF No. 13, at 4-5 & n.2), it is well-settled that as an administrative rather than medical assessment, an RFC need not mirror any medical opinions in the record. *See Titterington*, 174 F. App'x at 11 ("There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC."); *Myers v. Berryhill*, 373 F. Supp. 3d 528, 538 (M.D. Pa. Jan. 31, 2019) ("Nothing in the Social Security Act or governing regulations requires the ALJ to obtain matching "opinion" evidence in order to fashion a claimant's RFC."); *Cleinow v. Berryhill*, 311 F. Supp. 3d 683, 685 (E.D. Pa. May 1, 2018) ("*Doak* does not stand for the proposition that an ALJ cannot make an RFC determination in the absence of a medical opinion reaching the same conclusion. Such a rule would be inconsistent [with] the Third Circuit's express holding that '[t]he ALJ—not

treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations.'") (quoting *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011)); *Vargas v. Berryhill*, No. 16-2003, 2018 WL 1938312, at *8-9 (M.D. Pa. Mar. 13, 2018) ("In executing his administrative fact-finding duty, an ALJ does not reach a decision based on 'improper lay opinion regarding medical evidence' for lack of matching expert opinion evidence.") (quoting *Chandler*, 367 F.3d at 362); *Cummings v. Colvin*, 129 F. Supp. 3d 209, 214-15 (W.D. Pa. 2015) ("In Plaintiff's view, an ALJ can never review and interpret medical records and arrive at his own RFC finding unaided by an opinion from a physician as to a claimant's functional capacity . . . . [But Plaintiff's] reliance on *Doak* and other cases cited in his brief for the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided . . . . *Doak* 'does not . . . hold that an ALJ's RFC findings must be based on a particular medical opinion.'") (quoting *Doty v. Colvin*, No. 13-cv-00080, 2014 WL 29036, at *1 n.1 (W.D. Pa. Jan. 2, 2014)); *Callahan v. Colvin*, No. 13-1634, 2014 WL 7408700, at *1 n.1 (W.D. Pa. Dec. 30, 2014) ("The Third Circuit [in *Doak*] did nothing more than make a substantial evidence finding in light of a limited record and did not purport to create a rule that an RFC determination must be based on a specific medical opinion.").

Faced with this body of contrary case law, Plaintiff pivots in his reply to arguing that when an ALJ rejects the only relevant medical opinion he or she may not assess "a less restrictive RFC" than would be consistent with that (rejected) opinion, at least where the remaining evidence is "far to[o] complex" for someone who is not a medical professional to interpret. (Reply, ECF No. 14, at 1). But despite alluding to this argument in his opening brief as well, (Pl.'s Br., ECF No. 12, at 6, 8), Plaintiff never explains why the record regarding his right upper extremity was so complicated that the ALJ could not fulfill her duty, mandated by

applicable regulations, to review the relevant evidence and determine his RFC.[5] *See* 20 C.F.R. § 416.946(c) ("If your case is at the administrative law judge hearing level . . . , the administrative law judge . . . is responsible for assessing [the claimant's] residual functional capacity."); *see also Garrett v. Comm'r of Soc. Sec.*, 274 F. App'x 159, 163 (3d Cir. 2008) ("The ALJ must consider all evidence before him. . . . The determination of the claimant's RFC is the exclusive responsibility of the ALJ.") (citations omitted). Indeed, the ALJ detailed her review of the evidence and explained that she formulated the RFC based on his four-or-greater-out-of-five strength on shoulder flexion and abduction and normal vibration sensation. (R. 20). Elsewhere in the opinion, she acknowledged positive findings regarding his shoulder and the presence of carpal tunnel syndrome, but she also observed that upon examination his shoulder was "strong with 5/5 strength," he did not have frozen shoulder, he had full ROM throughout the rest of the right upper extremity, he showed no neurovascular deficits in potentially affected nerves, he had only minimal tendon retraction without significant muscle atrophy in the muscle belly, and his carpal tunnel syndrome was "mild." (R. 18-19). Despite Plaintiff's protestations to the contrary, these findings constitute more than a "scintilla" and thus meet the substantial evidence standard.[6] *Burnett*, 220 F.3d at 118.

As for the lack of any mental restrictions in the RFC, Plaintiff highlights that the State

---

[5] Plaintiff's argument would also end-run the case law set forth in the prior paragraph. As he would have it, although the ALJ need not base the RFC directly on any given opinion, if the ALJ rejects all relevant ones, the RFC must still be at least as restrictive as they are, despite the fact that he or she has found them unpersuasive. This contention is both illogical and contrary to the regulations, which reserves to the ALJ the determination of what weight, if any, to accord the medical opinion evidence. *Chandler*, 667 F.3d at 362.

[6] It is true that Plaintiff points to his own body of evidence potentially tending to support a greater restriction on the use of his right upper extremity than determined by the ALJ, (*see* Pl.'s Br., ECF No. 12, at 6-8 (citing R. 496-97, 528, 539, 627-28)), but such a showing does not suffice to upset the decision. *Simmonds*, 807 F.2d at 58.

agency psychological consultants opined that his limitations were "severe," suggesting that his functioning was "significantly limit[ed]," and that in the latter half of 2023 he complained to providers about symptoms, demonstrated mood and affect problems upon examination, and was diagnosed with major depressive disorder, recurrent, moderate, and unspecified trauma and stressor related disorders. (Pl.'s Br., ECF No. 8-9 (citing R. 59, 73, 483, 552-53, 575, 582) (case citations omitted)). However, as observed in Respondents' cited case law, "the mere diagnosis of [an impairment] is not enough, standing alone, to qualify a claimant for benefits." *Sullivan*, 904 F.2d at 847. Instead, the plaintiff must demonstrate how the "impairment or disorder results in disabling limitations." *Metzger v. Saul*, No. 19-270, 2019 WL 3530442, at *4 (E.D. Pa. Aug. 2, 2019) (citing *Walker v. Barnhart*, 172 F. App'x 423, 426 (3d Cir. 2006)). But here, as Plaintiff concedes, the consultants lacked sufficient evidence to opine as to limitations, (R. 59, 73), and the ALJ disregarded their reports on this basis. (*See* R. 20 ("These are not opinions to be evaluated as no functional limitations were provided."); *see also* 20 C.F.R. § 416.913(a)(2) ("A medical opinion is a statement from a medical source about *what you can still do* despite your impairment(s) and whether you have one or more impairment-related *limitations or restrictions* in the abilities listed in [the regulations.]") (emphasis added)). Additionally, she explained that by early 2024 Plaintiff's mood had improved, and no evidence existed that he ever sought specialized treatment. (R. 15); *see also Morales v. Comm'r of Soc. Sec.*, 799 F. App'x 672, 676-77 (11th Cir. 2020) ("A conservative treatment plan tends to negate a claim of disability . . . ."). Thus, the RFC determined by the ALJ is supported by substantial evidence, and Plaintiff's critique of its lack of mental limitations amounts to a mere "disagreement," not a basis to overturn the decision. *Perkins*, 79 F. App'x at 514-15; *Burnett*, 220 F.3d at 118.

For these reasons, the Court denies Plaintiff's second claim as well.

## VI. CONCLUSION

For the reasons set forth above, Plaintiff's request for review is **DENIED**. An appropriate Order follows.

BY THE COURT:

/s/ Lynne A. Sitarski
LYNNE A. SITARSKI
United States Magistrate Judge